IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THOMAS L.A. CROWLEY,

          Plaintiff,

                                  CIVIL ACTION
     vs.                           No. 04-2078-GTV

CITY OF BURLINGAME, KANSAS,

          Defendant.

**MEMORANDUM AND ORDER**

Plaintiff Thomas L.A. Crowley, formerly a law enforcement officer for Defendant City of Burlingame, Kansas, filed this action pursuant to 42 U.S.C. § 1983 alleging that Defendant violated his Fourteenth Amendment rights by depriving him of a property interest in continued employment and of a liberty interest without due process of law. Plaintiff also maintains that Defendant breached an implied contract of employment under state law.

This action is before the court on Defendant's motion for summary judgment (Doc. 26). For the following reasons, Defendant's motion is granted.

**I. FACTUAL BACKGROUND**

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in a light most favorable to Plaintiff's case. Immaterial facts and facts not properly supported by the record are omitted. References to testimony are from depositions, unless otherwise noted.

Defendant employed Plaintiff as a police officer from July 18, 2002 until March 13, 2003. Throughout Plaintiff's employment, Defendant was a city of the third class with a mayor-council form of government established pursuant to the statutes of Kansas.

In 2002, John Shaffer, Defendant's Chief of Police, began interviewing Plaintiff over the telephone for a law enforcement officer position.   At the time, Plaintiff resided in California, and he informed Chief Shaffer that he wanted to live closer to his family in Kansas.   Eventually, Chief Shaffer offered Plaintiff a position as a police officer for the City.   He felt that Plaintiff was "somebody who would definitely stick around," which was important to him.   Chief Shaffer informed Plaintiff that he was required to attend a police academy in Hutchinson, Kansas, and that after a ninety-day probationary period, during which Plaintiff could be removed, he would become a "full employee."[1]   Chief Shaffer told the officers he hired, including Plaintiff, that if they did their job and something happened, he would always stand behind them. Plaintiff testified that neither Chief Shaffer, nor anyone else told him that he would be fired only for cause.   Based on his own experiences and observations, and one comment made by Defendant's Superintendent of Public Works, Plaintiff believed that Defendant would not fire its employees as long they did their jobs.

On the first and third Mondays of each month, Defendant's City Council holds regular meetings.   As a part of its agenda, the City Council provides an opportunity for citizens to make

---

[1]      During the interview process, Chief Shaffer explained to Plaintiff that  "full employee" meant that Plaintiff became eligible for insurance benefits and a pay raise.   Chief Shaffer testified that he did not tell Plaintiff that after the ninety-day period he could only be fired for cause.

2

statements to the council regarding local issues.   During the public comment portion of the City Council's March 3, 2003 meeting, Ms. Deana McClanahan, a local resident of Burlingame, made a complaint about Plaintiff.   According to Ms. McClanahan's statement, on a prior weekend night a county officer pulled her over for failing to stop at a stop sign.   The county officer asked her to perform a sobriety test, and as the traffic stop carried on, Plaintiff arrived to provide back-up. During the course of the traffic stop, Ms. McClanahan stated that the county officer administered several field sobriety tests and did not issue a citation for driving while intoxicated.   Plaintiff remained in his vehicle throughout the traffic stop–only observing for support.   Ms. McClanahan believed that the officer initiated the traffic stop to catch drunk drivers leaving a nearby wedding party.   Ms. McClanahan stated that a few hours after the initial stop, she left her home to pick up her daughter from the babysitter.   Near her home, she alleges, Plaintiff met her at a stop sign by the school and turned his emergency lights on.   She claimed that Plaintiff told her that she did not need to be out at 1:00 o'clock at night because there were going to be a lot of drunks out on the road.   Ms. McClanahan believed that she had every right to be on the road to pick up her daughter and she felt that there was no reason for pulling her over.   She stated that Plaintiff's conduct "was totally uncalled for and just pure harassment."   She believed that Plaintiff wanted to harass her because she did not get cited earlier in the evening for a DUI.   In his deposition, Plaintiff provided his version of the encounter.   Plaintiff stated that he had "zero involvement" in the first encounter. Later on in the evening, he stated that he simply pulled his vehicle next to Ms. McClanahan's and asked her to slow down.  He did not perform a traffic stop.

After Ms. McClanahan's statement, the City Council discussed nine unrelated matters.   The

3

City Council then entered a fifteen minute executive session to discuss non-elected personnel. Chief Shaffer was called into the session and informed by Mayor Donald Parker that Councilmember Chris Dubois was tired of hearing complaints about Plaintiff and that the council was going to suspend him.   According to Chief Shaffer's deposition, Councilmember Dubois specifically mentioned Ms. McClanahan's complaint, as well as the fact that Plaintiff recently stopped one of Councilmember Dubois's relatives for speeding.   Chief Shaffer also testified that the City Council had concerns about the City becoming known as a speed trap.  The City Council did not ask for Chief Shaffer's recommendation on the matter.    Mayor Parker did not recommend Plaintiff's suspension.

When the City Council and Chief Shaffer returned to the regular meeting, Councilmember Dubois moved to return to executive session to discuss non-elected personnel.   City Attorney Rick Godderz was called into the session, but Chief Shaffer remained at the regular meeting.   After the City Council returned from the executive session, they unanimously voted to suspend Plaintiff with pay, effective immediately.   The City Council also set March 17, 2003, as Plaintiff's termination date, pending his right to request a hearing before the City Council regarding the suspension and proposed termination.   That same evening, Chief Shaffer informed Plaintiff of the City Council's decision.

On March 4, 2003, the City Clerk notified Plaintiff by letter of the decision to suspend him and to terminate him on March 17, pending his right to request a hearing in writing before the City Council.   The letter did not provide Plaintiff with a reason for his suspension and proposed termination.   On March 6, Plaintiff delivered a letter to the City Clerk asking for an open hearing

on his pending termination.  He also requested copies of any information that was going to be used against him.  Despite this request, Plaintiff did not receive any documents, complaints or reports pertaining to his job performance.  The City Clerk, however, per Plaintiff's request, transcribed Ms. McClanahan's statements from an audio recording taken at the March 3rd meeting.  She provided a copy to Plaintiff and City Attorney Godderz, and placed the original in Plaintiff's personnel file.

On March 13, 2003, the City Council held a special meeting concerning Plaintiff's proposed termination.  Over seventy people attended the meeting.  Among those present were the entire City Council, Mayor Parker, City Attorney Godderz, Plaintiff, his father, John Crowley, and Chief Shaffer.  The City Council began the special meeting by holding an executive session with Mr. Godderz for attorney-client privilege purposes.  When the City Council returned, they instructed those present that all questions needed to be directed to Mr. Godderz, who would speak on behalf of the City Council.  Mr. Godderz then stated that the City Council was not available for a debate or a dialogue, but was only there to listen to statements made by the public.  Mr. Godderz did make a statement that Plaintiff was an at-will employee.

Plaintiff asked to hear the complaints against him, but Mr. Godderz responded that the City Council would only do so in executive session.  Plaintiff refused to go to an executive session because he specifically requested an open hearing.  Plaintiff then informed the City Council that his father would speak on his behalf.  Chief Shaffer and his wife, Traci, also spoke briefly in favor of Plaintiff.  Chief Shaffer did not support or recommend the decision to suspend or terminate him.  Afterwards, the City Council returned to executive session for attorney-client privilege.

Upon their return, the City Council unanimously voted to terminate Plaintiff's employment as a law enforcement officer.   Mayor Parker did not recommend Plaintiff's termination.   Neither Mayor Parker nor any member of the City Council provided a statement to the media afterwards.

It is uncontroverted that Defendant never provided Plaintiff with a reason for his suspension or termination.   Plaintiff testified that he wanted to present evidence and call witnesses on his behalf at the special meeting, but it did not seem to be appropriate if the City Council was not going to engage in dialogue.   He stated that "[i]t would have made it a moot point to defend myself from something I didn't know."

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c).   Lack of a genuine issue of material fact means that the evidence is such that no reasonable jury could return a verdict for the nonmoving party.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Id. at 251-52.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.   This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case.   Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).   Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving

party to show that there is a genuine issue of material fact left for trial. Anderson, 477 U.S. at 256. "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Id. The court must consider the record in the light most favorable to the nonmoving party. Bee v. Greaves, 744 F.2d 1387, 1396 (10th Cir. 1984).

### III. DISCUSSION

"The Fourteenth Amendment's procedural due process protections apply only to an individual deprived of a recognized property or liberty interest." Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 536 (10th Cir. 1995) (citing Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972)). "In determining whether an individual has been deprived of his right to procedural due process courts must engage in a two-step inquiry:  (1) did the individual possess a protected interest such that the due process protections were applicable; and if so, then (2) was the individual afforded an appropriate level of process." Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994) (citations omitted).  Defendant argues that it is entitled to summary judgment because Plaintiff did not possess either a property or liberty interest that would entitle him to due process.

### A. Property Interest

Plaintiff, as a public employee, is entitled to procedural due process only if he can establish that Defendant deprived him of a property interest. Driggins v. Oklahoma City, 954 F.2d 1511, 1512 (10th Cir. 1992) (citations omitted).  "'Property interests . . . arise from independent

sources such as state statutes, local ordinances, established rules, or mutually explicit understandings.'" <u>Snyder v. City of Moab</u>, 354 F.3d 1179, 1189 (10th Cir. 2003) (quoting <u>Dickeson v. Quarberg</u>, 844 F.2d 1435, 1441 (10th Cir. 1988)).  In this context, "the touchstone is whether, under state law, the employee has 'a legitimate claim of entitlement' in continued employment, as opposed to a 'unilateral expectation' or 'an abstract need or desire' for it." <u>Farthing</u>, 39 F.3d at 1135 (citations omitted).

Plaintiff maintains that he possessed a property interest in continued employment arising from an implied-in-fact-contract with Defendant.  <u>See Hulen v. Yates</u>, 322 F.3d 1229, 1240 (10th Cir. 2003) (citations omitted) (observing that property interests may be created by "contract, implied contract and rules and understandings developed by state officials").  Based upon the City Code of Burlingame, the representations of Chief Shaffer, and the policies and procedures of the police department, Plaintiff claims that under an implied contract of employment, he could not be removed as a police officer unless and until:   (1) he was not satisfactorily performing his duties; and (2) he was removed by Mayor Parker subsequent to Chief Shaffer's recommendation.  In addition, Plaintiff claims that he possessed an implied contract entitling him to a due process hearing.  Defendant denies the existence of  any implied contracts and asserts that Plaintiff was an employee-at-will, and thus, he did not have a constitutionally protected property interest in continued employment.

"An employee-at-will has no property interest in continued employment." <u>Moorhouse v. City of Wichita</u>, 913 P.2d 172, 180 (Kan. 1996).  Kansas is an employment-at-will state and

in the absence of a contract, express or implied, between an employee and his

employer covering the duration of employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged.

Johnson v. Nat'l Beef Packing Co., 551 P.2d 779, 781 (Kan. 1976) (citations omitted). The same at-will presumption holds true for public employment. Farthing, 39 F.3d at 1136. Kansas courts have observed that "the law regarding a public employee's property right in continued employment is that 'the tenure of any office not provided for in the constitution may be declared by statute, and when not so declared such office shall be held at the pleasure of the appointing authority.'" Riddle v. Ottawa, 754 P.2d 465, 468 (Kan. Ct. App. 1988) (quoting Stoldt v. City of Toronto, 678 P.2d 153, 160 (Kan. 1984)).

Here, Plaintiff relies on an implied contract theory. "The existence of an implied contract depends on the intent of the parties, divined from the totality of the circumstances." Anglemyer, 58 F.3d at 537. To guide this determination, the Kansas Supreme Court has stated:

"Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced."

Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1492-93 (10th Cir. 1995) (quoting Morriss v. Coleman Co., 738 P.2d 841, 848 (Kan. 1987) (further citation omitted)). The Tenth Circuit has stated that "whether an implied contract exists which creates a property interest in employment is normally a question of fact for the jury," Koopman v. Water Dist. No. l, 972 F.2d 1160, 1164 (10th Cir. 1992), citing "the necessity of determining both parties [sic] subjective intent to form

9

a contract." <u>Anglemyer</u>, 58 F.3d at 537 (citation omitted).   Despite this general rule, summary judgment is appropriate where no material facts are in dispute and where "'the plaintiff presents only evidence of his own unilateral expectations of continued employment.'"   <u>Warren v. City of Junction City</u>, 176 F. Supp. 2d 1118, 1126 (D. Kan. 2001) (citations omitted).

Plaintiff contends that the statements of Defendant's supervisory employees provide sufficient evidence to allow this case to be presented to a jury on an implied contract theory. First, Plaintiff cites Chief Shaffer's deposition testimony regarding the hiring process for Plaintiff's position.   Chief Shaffer testified that he was looking to hire someone "that was going to stick around."   He believed that Plaintiff was that kind of person because Plaintiff expressed an interest to move closer to his family in Kansas and to work there for a long period of time.   After hiring Plaintiff, Chief Shaffer informed him that after a ninety day probationary period in which he could be removed, he would become a "full" employee.   He also told Plaintiff that if he did his job, and something happened, he would always back him up and support him.   Plaintiff also testified that his own experience suggested that Defendant had a custom and practice of not firing employees who were satisfactorily meeting their job responsibilities.   Specifically, he stated that "while I was there they had City employees that seemingly were doing their jobs to the capacities they were expected and . . . they maintained their positions."   Plaintiff also recalled that on one occasion Roy Rickel, Defendant's Superintendent of Public Works, said something to the effect that Defendant "never had anybody lose their job for doing it."

The court concludes that a reasonable jury could not infer from Chief Shaffer or Superintendent Rickel's statements that Defendant intended to provide Plaintiff with a contract

for continued employment for a definite term.   Rather, these statements only support Plaintiff's subjective belief that he would not be terminated unless he was not satisfactorily performing his job.   The law is clear that unilateral expectations of continued employment do not give rise to an implied contract.     Additionally, the court questions the ability of either Chief Shaffer or Superintendent Rickel to create an implied contract of employment in the first place.   See Warren, 176 F. Supp. 2d at 1121 (holding that Kansas law precluded a city manager from entering into an implied contract with the police of chief); Dehart v. City of Manhattan, 942 F. Supp. 1395, 1401 (D. Kan. 1996) (holding that Kansas law precluded the defendant from entering  into an implied contract with the operator of the city's waste water treatment facility).

Plaintiff also argues that he possessed an implied contract that as an employee of the police department, he could only be removed by the Mayor upon the Chief of Police's recommendation. For this proposition, Plaintiff relies on § 1-303 of the Code of the City of Burlingame, Kansas ("the Burlingame Code").   Section 1-303, entitled "Removal," reads:

> (a) Employees, other than appointed officers, may be removed by the mayor upon the recommendation of the respective department heads.

> (b) No officer or employee shall be removed for any reason until he or she has been given notice and afforded the opportunity for a hearing.

Here, neither Mayor Parker nor Chief Shaffer recommended Plaintiff's termination.   In addition, Plaintiff points out that both the current Mayor of Burlingame, Roy Hovestadt, and Chief Shaffer interpreted § 1-303 to be the only avenue to discharge an employee.

Defendant, however, maintains that Plaintiff's interpretation is contrary to the statutory scheme set up by the Kansas Legislature and Defendant's ordinances and codes.   Defendant

acknowledges that upon recommendation from a department head, § 1-303 gives the mayor the power to remove employees, subject to a later hearing before the governing body.     Defendant, however, claims that § 1-303 does not limit the City Council's ability to remove officers–i.e., the mayor's removal power is not exclusive.   It is Defendant's position that the City Council, as the governing body, always has the power to terminate employees and that Plaintiff served at the pleasure of the City Council.   The court will review the pertinent state statutes, city ordinances, and sections of the Burlingame Code.

Defendant is a city of the third class with a mayor-council form of government established pursuant to the statutes of Kansas.  See Kan. Stat. Ann. §§ 15-101 et. seq.  Kan. Stat. Ann. § 15-204 governs the appointment and removal of city officers.  It provides:

> The mayor, with the consent of the council, may appoint, at the first regular meeting of the governing body in May of each year, the following city officers: A municipal judge of the municipal court, a clerk, a treasurer, a marshal-chief of police, law enforcement officers and such other officers as deemed necessary.   Such officers shall hold an initial term of office of not to exceed one year and until their successors have been appointed and qualified.   Any officers who are reappointed shall hold their offices for a term of one year and until their successors are appointed and qualified.  The duties and pay of the various officers shall be regulated by ordinance.   Any officer may be removed by a majority vote of the total membership elected or appointed to the council and may be suspended at any time by the mayor.

Th Kansas Supreme Court construed this statute in Stoldt v. City of Toronto, 678 P.2d 153  (Kan. 1984).  In Stoldt, the plaintiff claimed that the defendant, a city of the third class, deprived him of a property interest without due process as the city's night watchman.  Id. at 159.  In denying the plaintiff's claim, the court looked to the applicable state law, Kan. Stat. Ann. § 15-204, and stated:

> This statute does not provide for any term of office.   It additionally allows a mere

12

majority of the members of the city council to remove any such officer at will. There is no requirement that the council have or give cause for the termination. The appellant in this case had no constitutionally protected property right in his position as night watchman.

Id. at 160.

Nevertheless, Kansas Supreme Court's construction of Kan. Stat. Ann. § 15-204 does not end the court's inquiry. On June 21, 1993, Defendant passed Charter Ordinance No. 10. This ordinance exempted Defendant from the provisions of Kan. Stat. Ann. § 15-204 and provided substitute and additional provisions on the same subjects. The replacement provisions are contained in § 1-301 of the Burlingame Code. That section, entitled "Appointment," states in relevant part:

> (a) The mayor shall appoint, with the consent of the council, a police chief, city clerk and superintendent of utilities, parks, streets. Officers so appointed and confirmed shall hold their offices until resignation, retirement or discharge for cause by the mayor with the approval of a 2/3 majority of the members-elect of the council. The council shall by ordinance specify the duties and compensation of all such officers and may by ordinance passed by a 2/3 majority of the members-elect of the council abolish any office so created whenever they may deem it expedient.

> (b) The mayor, with the consent of the council, may appoint, at the first regular meeting of the governing body in May of each year, a city attorney, city treasurer, and municipal judge, to hold an initial term of office of not to exceed one year and until their successors have been appointed and qualified. Upon reappointment, they shall hold their office for a period of one year and until their successor is appointed and qualified. The pay shall be regulated by ordinance. Any such appointee may be removed by a majority vote of the total membership elected or appointed to the council and may be suspended at any time by the mayor.

In contrast with Kan. Stat. Ann. § 15-204, Burlingame Code § 1-301(a) states that the positions of police chief, city clerk, and superintendent of utilities, parks, streets (a position not

mentioned in Kan. Stat. Ann. § 15-204) may only be discharged for cause or by an ordinance abolishing the office.   Thus, § 1-301(a) appears to create property interests for those stated positions.   Consistent with Kan. Stat. Ann. § 15-204, Burlingame Code § 1-301(b) retains the at-will status of the city attorney, city treasurer and municipal judge.   While § 1-301 does not mention the procedure for appointing law enforcement officers, Burlingame Code §§ 10-101 and 1-302 provide direction.   Section 10-101, entitled "Police Department," states that "[t]he law enforcement department shall consist of a chief of police and such number of regular law enforcement officers as shall be appointed as provided by Kan. Stat. Ann. § 15-204."   Additionally, § 1-302, entitled "Employees," states that "[t]he mayor with the consent of the council shall have authority to hire all other employees, or such authority may be delegated to the respective department heads."   Therefore, both sections are consistent in that they provide for appointment by the mayor with the consent of the council.   Section 1-302, however, goes one step further.   It allows the appointment authority to be delegated to department heads.   In Plaintiff's case, it is uncontroverted that Chief Shaffer hired him under § 1-302's delegation of authority, rather than Mayor Parker formally appointing him with the consent of the City Council.

Defendant makes two arguments in support of its position that the City Council had the authority to remove Plaintiff.[2]   First, Defendant asserts that the provision in Kan. Stat. Ann. § 15-204 allowing a majority of the City Council to remove an officer is operative because of Burlingame Code § 10-101's reference to the statute.   Second, Defendant contends that

---

[2]   The court observes that Plaintiff has failed to respond to either of these arguments in his brief.

14

Burlingame Code § 1-202 gives the City Council residual authority over all of Defendant's employment decisions.  That section reads:

> All powers exercised by cities of the third class or which shall hereafter be conferred upon them shall be exercised by the governing body, subject to such limitations as prescribed by law.  All executive and administrative authority granted or limited by law shall be vested in the mayor and council as governing body of the City.[3]

At first glance, Plaintiff's position appears reasonable.  Because § 1-302 governs the hiring of city employees, one might construe § 1-303's specific mechanism for removal of employees to control the day.  The court believes, however, that the city council possesses the inherent authority to remove at-will employees, including Plaintiff.  First, Burlingame §§ 1-301 and 1-302 give the city council appointment authority over appointed officers and non-appointed employees. The necessary implication from these express powers is that the council possesses the authority to remove those officers.  Second, the court notes that § 1-301(a) provides the mayor, with approval of the city council, the power to discharge certain appointed officials for cause.  In addition, § 1-301(b) provides the city council the authority to remove, by a majority vote, certain officers appointed and employed at-will, but only gives the mayor authority to suspend those individuals.  With this background, the court interprets § 1-303 as adding to the  mayor's power to remove (as opposed to merely suspending) all other non-appointed, at-will  employees without waiting for action by the city council.  Thus, § 1-303 provides the mayor *additional authority* as

---

[3]     Burlingame Code § 1-202 was promulgated under the authority of Kan. Stat. Ann. § 12-103, which provides that "[t]he powers hereby granted shall be exercised by the governing body of such city."

15

opposed to *restricting the city council's authority* to remove at-will employees by a majority vote (emphasis added). This interpretation is bolstered by § 1-303's permissive, rather than mandatory, language. Finally, the court is convinced that § 1-202's general grant of residual authority and Burlingame Code § 10-101's reference to Kan. Stat. Ann. § 15-204 support this interpretation. Accordingly, the court rejects Plaintiff's view that he possessed an implied contract restricting Defendant's ability to remove him unless Mayor Parker removed him subsequent to Chief Shaffer's recommendation.

Finally, the court addresses Plaintiff's position that § 1-303(b) creates an implied contract to a due process hearing. See Carnes v. Parker, 922 F.2d 1506, 1511 (10th Cir. 1991) (citations omitted) ("Although procedural protections themselves are not sufficient to create a property interest in continued employment, they can sustain an entitlement to the procedures themselves"). To support this claim, Plaintiff points out that in the "Preface" section of the Burlingame Code, users are "directed to the Governing Body Handbook, published by the League of Kansas Municipalities . . . as a source of general information . . . ." In particular, the Governing Body Handbook ("the handbook") contains a section on property interests. The handbook states that a pretermination due process hearing must contain notice of the charges against the employee, an explanation of the evidence the employer intends to use against the employee, and an opportunity for the employee to present his or her account of the charges.

Plaintiff's argument fails. First, Plaintiff is not entitled to due process protections based on his at-will status. See Warren, 176 F. Supp. 2d at 1130 (rejecting the plaintiff's claim "that he was denied a property interest consisting of a contract right to a grievance procedure"). Plaintiff's

reliance on the handbook is misplaced.  It expressly states that the due procedure procedures apply to "an employee . . . discharged 'for cause.'"  Second, § 1-303(b)'s provisions are not implicated because the city council terminated Plaintiff, not the mayor.  Even if § 1-303(b) controlled, Plaintiff received written notice of his proposed termination, a hearing before the city council, and an opportunity to discuss the charges against him in an executive session, which he refused. In short, Plaintiff received due process beyond what the law required.

In summary, Defendant employed Plaintiff at-will, and thus, Plaintiff did not possess an property interest in continued employment.  The Kansas Supreme Court in <u>Stoldt</u> held that the positions listed in Kan. Stat. Ann. § 15-204, including the law enforcement officer position, could be terminated at-will.  Defendant's enactment of Burlingame Code § 1-301 changed this outcome only for the positions of police chief, city clerk and superintendent of utilities, parks, streets. There is no indication that Plaintiff possessed employment for a definite term or that he could only be terminated for cause.  Plaintiff's implied contract theory, based on Burlingame Code § 1-303 and the statements of Chief Shaffer and Superintendent Rickel, fails to defeat the at-will employment presumption.  His contention that he possessed an implied contract right to a due process hearing also does not have merit.  Defendant's motion for summary judgment on Plaintiff's property interest claim is therefore granted.[4]

### B. Liberty Interest

For Plaintiff to state a liberty interest claim, the Tenth Circuit requires a showing that: "(1)

---

[4]     Based on the court's conclusions, Plaintiff's implied contract claim under state law is also dismissed.

the defendant made a statement impugning his . . . good name, reputation, honor, or integrity; (2) the statement was false; (3) the defendant made the statement in the course of termination proceedings or the statement foreclosed future employment opportunities; and (4) the statement was published." Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 526 (10th Cir. 1998) (citation omitted). "These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest." Workman v. Jordan, 32 F.3d 475, 481 (10th Cir. 1994) (citation omitted). "[T]he Due Process Clause requires an adequate name-clearing hearing" if all the elements are established. Tonkovich, 159 F.3d at 526.

### i. Stigmatizing Statement

Plaintiff argues that Ms. McClanahan's statement at the March 3rd City Council meeting accusing him of "pure harassment" was sufficiently stigmatizing to implicate his good name, reputation, honor, or integrity. Plaintiff asserts that a reasonable jury could conclude that Defendant adopted Ms. McClanahan's statements when it suspended and terminated Plaintiff. To support his adoption theory, Plaintiff relies on the Tenth Circuit's decisions in Melton v.City of Oklahoma City, 928 F.2d 920 (10th Cir. 1991) and McGhee v. Draper, 564 F.2d 902 (10th Cir. 1977), as well as Judge Lungstrum's decision in Warren v. City of Junction City, 176 F. Supp. 2d 1118 (D. Kan. 2001). It is not necessary to reach the merits of Plaintiff's adoption theory because the court determines that Plaintiff's liberty interest claim fails on the first two elements required to establish a liberty interest claim.

Plaintiff must first show that Defendant's statement was stigmatizing. Warren, 176 F. Supp. 2d at 1132 (citing Garcia v. City of Albuquerque, 232 F.3d 760, 772 (10th Cir. 2000)). This

determination is a matter for the court.   Palmer v. City of Monticello, 31 F.3d 1499, 1503 n.2 (10th Cir. 1994). "A statement is stigmatizing if it involves accusations of dishonesty or immorality."   Warren, 176 F. Supp. 2d at 1132-33 (statements in a report accusing the plaintiff of "mismanaging the police department, ignoring possible crimes, engaging in selective law enforcement, unequally enforcing policies, and intimidating contract negotiations" were stigmatizing) (internal quotations omitted); see also Bailey v. Kirk, 777 F.2d 567, 580 (10th Cir. 1985) (accusation of misappropriation of police property stigmatizing).

"In contrast, . . . allegations of improper job performance are not generally so stigmatizing as to injure the employee's reputation . . . ."   Burk v. Unified Sch. Dist. No. 329, 646 F. Supp. 1557, 1565 (D. Kan. 1986) (citations omitted) (citing Weathers v. West Yuma County Sch. Dist., 530 F.2d 1335, 1339 (10th Cir. 1976); Abeyta v. Town of Taos, 499 F.2d 323, 327 (10th Cir. 1974)). "When, however, the charges go to the 'fundamental capacity' of the employee to perform his job, the charges may be stigmatizing."   Id. (citing Garcia v. Bd. of Educ. of Socorro Consol. Sch. Dist., 777 F.2d 1403, 1419 (10th Cir. 1985)); see also Miller v. City of Mission, 705 F.2d 368, 373 (10th Cir. 1983) (charges that police department morale was low, that officers did not respect the Chief and Assistant Chief, and that officers "could not work effectively with the Chief and Assistant Chief" went to the overall competency of the plaintiff and, thus, were stigmatizing).

The court concludes that Ms. McClanahan's statements, as a matter of law, are not sufficiently stigmatizing to implicate a liberty interest.   Ms. McClanahan complained that Plaintiff harassed her when he "showed up" while a county officer was performing a sobriety test on her and that, later on in the evening, he pulled up next to her at a stop sign and told her that she "didn't need

to be out at 1:00 o'clock at night" because "there were going to be a lot of drunks out on the road and . . . [she] did not need to be out there . . . [by herself]." In Councilmember Dubois's deposition, he recalled that Ms. McClanahan complained that Plaintiff was being "overzealous," stopping her for no reason. The only case Plaintiff cites to support the stigmatization element is the Tenth Circuit's decision in Palmer v. City of Monticello, 31 F.3d 1499 (10th Cir. 1994). That case is distinguishable because the police officer's honesty was put at issue when he was charged with falsifying a speeding ticket. Id. at 1503. The nature of Ms. McClanahan's accusations concern her dissatisfaction with Plaintiff's job performance, but they do not rise to the level of questioning Plaintiff's "fundamental capacity" to perform his job or his integrity. In sum, the court finds that Ms. McClanahan's charges are not of the kind that would seriously damage Plaintiff's standing or associations in the community to deprive him of a liberty interest. See id. (citations omitted).

## ii. Falsity of Statement

The court also concludes that Plaintiff has not made a colorable showing that Ms. McClanahan's statements were false. See Warren, 176 F. Supp. 2d at 1133 (citing Garcia, 232 F.3d at 772). Plaintiff argues that a factual issue exists because Plaintiff, in his deposition, disputed the truthfulness of Ms. McClanahan's statements:

> Q. Any other occasions that it was brought to your attention that it was felt generally that you were not treating citizens with the appropriate demeanor?
>
> A. There was a woman that went to the City Council. I can not recall her name. She complained about a traffic stop the deputy performed that I quite literally had zero involvement in, I never even got out of the patrol vehicle. And I ended up seeing her later on that evening and I did not perform a traffic stop but stopped next to her and asked her to slow down.

Defendant responds that Plaintiff has not disputed the truthfulness of Ms. McClanahan's statement. Defendant contends that Plaintiff's deposition testimony about his conduct on the evening in question is consistent with Ms. McClanahan's complaint.   The only dispute, Defendant maintains, are the inferences that might be drawn from Ms. McClanahan's complaint.   The court agrees.   A genuine dispute does not exist as to the underlying facts contained in Ms. McClanahan's complaint.    Plaintiff's testimony acknowledges that he was present when the county officer performed field sobriety tests on Ms. McClanahan and he does not question that he stopped her later in the evening.   Plaintiff may disagree with Ms. McClanahan's characterization of his conduct as harassment, but he has not contradicted her statements.

Because Plaintiff fails to establish his liberty interest claim on the first two elements, it is unnecessary to review the merits of the last two elements or his adoption theory.   Defendant's motion for summary judgment on Plaintiff's liberty interest claim is therefore granted.

IT IS, THEREFORE, BY THE COURT ORDERED that Defendant's motion for summary judgment (Doc. 26) is granted.

Copies of this order shall be transmitted to counsel of record.

The case is closed.

**IT IS SO ORDERED.**

Dated at Kansas City, Kansas, this 18th day of January 2005.


/s/ G.T. VanBebber
G. Thomas VanBebber
United States Senior District Judge

21